UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

Plaintiff,

v.                                          NO.  3:22-CR-00226-(SVN)

MARK CARBUTTI

Defendant.                                  APRIL 27, 2023

### DEFENDANT MARK CARBUTTI'S SENTENCING MEMORANDUM

This is a sentencing memorandum for Mark Carbutti.  We will request a below guideline variance sentence of a year and a day and a recommendation to a Federal Prison Camp with RDAP program availability.

We present through the information in this and other submissions a justification for the requested sentence.

### INTRODUCTION

Mark's case, at first blush, does not present a sympathetic picture.  A successful lawyer divorces his wife and engages in a lifestyle of drugs, alcohol and gambling that trashes his practice, exposes his clients to risk and, along the way, evades payment of more than $500,000.00 in taxes.  What we hope to present is an explanation – an explanation, not an excuse – for Mark's actions.  And that explanation will, we believe, justify the non-guideline sentence requested.

## THE LAW OF SENTENCING

This Court well knows the applicable sentencing statute, 18 USC

3553(a). It is set forth in the footnote below.[1]  This Court will continue to

---

[1] 18 U.S.C. §3553(a) provides in pertinent part:

[2] **(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

receive sentencing memoranda more learned and articulate than this, synopsizing in various ways the statutory considerations and reviewing the evolution of sentencing law from adoption of the Sentencing Guidelines in 1987 to today when Guidelines are, happily, advisory, not presumed reasonable, and serve only as a starting point for analysis.

The basic law of post-Booker sentencing boils down to the following principles:

1. The guidelines are no longer mandatory but advisory;

2. The District Court's sentences are reviewed on an abuse of discretion standard for reasonableness;

3. A guideline sentence is not presumed to be reasonable; and

4. In imposing a non-guideline sentence, the Court is required to comply with the considerations set forth in 18 U.S.C. § 3553(a) and can afford whatever weight it believes appropriate to each of the factors outlined in the statute, with the goal that the sentence imposed should be sufficient but not greater than necessary to satisfy the requirements of the statute).

---

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced. [FN1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

There was a time in the years after adoption of the Guidelines when the defense bar collectively stamped its feet and used the word "draconian" so frequently in sentencing memoranda that it became a colloquialism. Both those attorneys and many judges engaged in intellectual contortions seeking escape from the restrictions imposed by the Guidelines. Thanks to outstanding advocacy and a receptive judiciary, those days are gone. Within the confines of 18 U.S.C. 3553(a) there exists a flexibility that allows sentencing Courts to appropriately weigh all relevant aspects of the cases and people who are to be sentenced. The "sufficient but not greater than necessary" standard, as interpreted by the Courts, has amended the arbitrary arithmetic that formerly existed.

**NATURE AND CIRCUMSTANCES OF THE OFFENSE**

The Pre-Sentence Report and the Stipulation of Offense Conduct attached to the plea agreement (Document No. 6) accurately spell out Mark's actions, what he did that violates the law. The taxes not paid amount – $549,332.13 (Paragraph 14) – is arithmetically accurate.[2]

There are two aspects of the nature and circumstances of the offense that merit special attention. First is that Mark's illegal conduct effectively began when he learned he was infertile, a devastating blow. That realization and his inability to confront and deal with it imploded his marriage which disintegrated in 2014, 15 and beyond. The circumstances, as more fully

---

[2] Inclusion of the penalties and interest as part of the Section 2T1.1 calculations and Application Note 1 of that section will be discussed below.

4

explained in Dr. Madelon Baranoski's report[3] (Exhibit B) is directly linked to his lifestyle behavior and the tax evasion that flowed from it. That is important for context.

Second, the tax due amount for 2013 requires an explanation. As noted in Paragraph 14 of the PSR (and again referred to in counsel's letter to probation dated April 17, 2023, Page 3 attached to the PSR) the tax due amount for 2013 resulted from a tax audit for earlier years which concluded there were inappropriate depreciation claimed in those years. The ultimate result was that in December of 2017 Mark accepted the amended tax loss figures and agreed that the amended returns would be filed for and applied to the 2013 tax return year. It is for that reason that the tax due amount – $205,772.00 – is as high as it is and out of proportion to the other tax years. Obviously, that skews the tax loss amount up significantly, almost forty percent of the entire tax loss of $549,332.00.

**HISTORY AND CHARACTERISTICS OF MARK CARBUTTI**

From one perspective, Mark's case is almost a Netflix caricature. A 40-year-old lawyer gets into booze, drugs and gambling, leaves his wife, ignores his clients and destroys his law practice in pursuit of a hedonistic lifestyle. Along the way, of course, he doesn't pay his taxes for years. Not a very sympathetic picture and perhaps not a comfortable basis for variance below sentencing guidelines. But, that caricature is not accurate.

---

[3] Dr. Madelon Baranowski is a psychologist and longtime Professor of the Law and Psychiatry Department of the Yale School of Medicine.

An accurate portrait of Mark is rather found in Mark's own statement, (Exhibit A), a lengthy report from Dr. Madelon Baranoski, Paragraphs 41 and 47, 49, 50, 51-62 and 67 of the Pre-Sentence Report.

There are three significant factors that provide an understanding of Mark's actions that led to his conviction:

- a significant childhood medical problem which required open-heart surgery; left a disfiguring scar and resulting in insecurity, anxiety and low self-esteem;

- a devastating medical diagnosis of infertility and not capable of fathering children that magnified his anxiety, disappointed his parents and demolished his self-esteem;

- a complete inability to deal with the anxiety and avoiding it by hiding in a lifestyle of substance abuse, gambling, and risky behavior. The short version is that Mark's actions were the result of Mark's mental and emotional make-up caused by his medical conditions.

A significant heart problem at birth required open heart surgery when he was five. It resulted in a disfiguring scar that influenced his self-image and sense of worth throughout his youth[4]. It is recognized as the Vulnerable Child Syndrome. As described by Dr. Baranoski:

> . . . Mr. Carbutti was a vulnerable child [footnote omitted], a term applied to children with serious medical conditions that define the child as a special, at risk of an early death, weak and needing protection. The vulnerable child designation affects the family and emotional and social development of the child. Mr. Carbutti was the

---

[4] For years he would never take his shirt off in public or before his peers.

youngest in a family of robust healthy sons. He was different and weak, required special care, and even after his heart surgery that corrected the physical condition, he had frequent assessments and procedures, and he was left with a scar that reminded him and his family of his defect and vulnerability.

Mr. Carbutti describes experiences typical for the vulnerable child – his need for attention, his shame about his body and the scar, his badge of defect, his detachment from his peers and general social isolation, his acting out to challenge his status, his pervasive sense of failure, and under achievement in school. To the credit of his family and to him, in high school he began his recovery under the protection of his socially popular brothers. He lost weight and increased physical activity and had his first romantic relationship, risking rejection but discovering that acceptance was possible.

Baranoski Report p. 13.

Dr. Baranoski describes Mark's sense of dependence on others, a sense of abandonment when first attending college and feeling stuck and alone. When he was required to move back home after college, he felt worthless and flawed. Again, he sought and received help from his family. He had a need to prove that he was normal. It was his family that guided him to go to law school.

Once married, Mark knew he wanted a family. He wanted grandchildren for his parents. His early success at law gave him a sense that he was not defective but Dr. Baranoski notes that Mark had "a fragile self-image and sense of value despite his adult successes".[5]

---

[5] Dr. Baranoski's report is detailed and lengthy and presents Mr. Carbutti more effectively than can be summarized here.

When Mark learned that he was infertile, he suffered a devastating blow. He is not able to provide his parents the grandchildren they wanted. When he learned the cause – it was him and not his wife – the marriage understandably began to dissolve. Mark's inability to address the issue, to even effectively discuss it with his wife, made divorce inevitable. As Dr. Baranoski notes, "he viewed each failure as a mark of his defect, his fault, and his worthlessness. This physical defect was one that could not be overcome".

Dr. Baranoski goes on to report:

> Without treatment and counseling around his childhood cardiac defect, he had never integrated a self-image independent of physical limitations. Rather, he viewed himself as escaping from his defect and maintaining an image that was stable only in the presence of successes. Adversity toppled his identity and his sense of value and worth. He viewed his sterility as a character defect. His sense of shame and loss prevented him from attending to his wife's sadness and from considering other options for having a family. He was thrust back into being vulnerable and helpless, as he was as a child. He was not available as a husband; he wanted his flaw to be a secret, he viewed his sterility as defining him. His wife's struggle and sadness symbolized his failure, just as the scar had when he was a child. He was unable to comfort or support her and rejected her attempts to help him. The couple could not "get through this together" because Mr. Carbutti could not see the problem as one they both shared – he was defective, the problem was his, and he had to find a way to escape it. The couple separated in 2015 and divorced in 2017. By the time of the separation, Mr. Carbutti was in the throes of his addiction.

Mr. Carbutti was emasculated. He avoided his problems. He did not confront them. His avoidance took the form of alcohol, cocaine, and gambling.

The point – an important one – is that Mark was not so much addicted to cocaine and alcohol as he was committed to avoiding problems and failing to

address them. And the avoidance was a lifestyle he had never previously experienced nor sought. He was defective and felt responsible for the defect. He was emasculated. He could not provide the grandchildren his family wanted. He ran from his troubles.

Mark began life with a fractured emotional foundation because of his heart condition and the scars both physical and emotional. When that foundation collided with his infertility, he looked for escape and found it in drugs, alcohol and a lifestyle that included the risks of near overdose, reckless driving and unprotected sex with multiple partners.

The driving force of his action was not the addition, but the avoidance.

## 1. **Confronting the Inevitable – The Lawyer Part**

Predictably and inevitably, the walls came tumbling down on Mark. That happened in July of 2020 the Office of Chief Disciplinary Counsel filed an application for an interim order of suspension. Then came the Court order and appointment of a trustee for his practice to protect the clients. Mark applied to be placed on inactive status because of substance abuse. That was granted. He continues on that status with the bar.

There is always a concern when a lawyer goes astray that clients will suffer. Indeed, protecting clients is the primary responsibility of Disciplinary Counsel. In this case, protection has been accomplished quickly, thoroughly, and well. Attorney Steven J. DeFrank of Levy, Leff & DeFrank was appointed

trustee to the practice. He has monitored the firm's cases[6], all referred to counsel with clients' permission. There is a fee agreement which assures payment to the firm of a portion of any fee earned. Attorney DeFrank has husbanded funds to which the Carbutti Firm is entitled. He continues to do so. He has received to date nearly $600,000.00. (See Exhibit C). The result is that all clients have received or will receive all the funds to which they are entitled, supervised by the Connecticut Superior Court. (Abrams, J.) Equally important, funds for the "providers" – physicians, healthcare organizations etc. and other costs – are available and either have been or will be paid under Court supervision.

Looking ahead for restitution purposes, additional fees to which the firm is entitled are expected from referred counsel. The amount and timing is uncertain. There is reason to expect, however, that payment will be well in excess of $150,000.00. Attorney DeFrank will stay on as Trustee. He understands his responsibility to honor any restitution order issued by this Court.

## 2. **Confronting the Inevitable – The Personal Part**

The dimensions of Mark's character – a component of the statutory "characteristics" – is best gauged in how he addressed his substance abuse and lifestyle issues. The interim suspension application was a wake-up call. But it took a while to sink in.

---

[6] Virtually all of the cases are personal injury cases which were taken on a contingent fee basis.

Leading up to that, Mark had periodically consulted a local therapist, but never really invested in the process. Now, early on after action by the bar, he renewed his efforts with the therapist. He still really wasn't there. Ultimately, though, when he sought legal counsel and reconnected actively with his therapist, he enrolled in an in-patient substance abuse program, Sierra Tucson (Paragraph 55). From there he continued to a follow-up program, Nsight (Paragraph 56). Both programs, both highly regarded, are intense and intensive. Mark was in intensive therapy under the supervision of these two programs for more than three months. The duration is not as important as the results.

Treatment for Mark for alcohol and drug addiction was a success. He has remained free of substance abuse since discharge. The analysis confirmed the obvious: alcohol and drug dependency. It also confirmed lifelong anxiety and depression (reported in greater depth by Dr. Baranoski, Exhibit B). Given the anxiety and depression, it is not surprising that the two west coast programs and the subsequent intensive outpatient program (Paragraph 57) were successful. They are designed to focus on addiction issues.

The underlying anxiety, insecurity, inadequacy and depression remain. Generically, those issues are of a different kind and dimension than addiction issues. In Mark's case that is especially so. These, unlike substance abuse and addiction, are not problems or issues easily identified and subject to a focused, short-range treatment. These lifelong problems remain a work in progress for Mark. Unfortunately, because he is without adequate insurance,

11

he has found it difficult to follow through with treatment necessary to address those issues.

### 3. **Contrition**

Inevitably those caught for improper or illegal actions almost always say they are sorry. It is difficult, of course, to gauge the sincerity or depth of the contrition articulated. Is it a sorrow at being caught or is it a true contrition, sorrow for having committed the act? What is unique about Mark's case is that his contrition comes from a different place: he has failed himself. That is a different burden, punishment for which escape is almost impossible. Mark's low sense of self-worth and anxiety stems from his childhood medical issues. The devastating infertility diagnosis repeated the flaw that shaped his personality. only this time magnified. Once again, a medical condition makes him less worthy. He is emasculated.

Feeling unworthy as a child, it again confirmed physically he is not a complete man. For many, both male and female, the inability to reproduce is crushing and overwhelming. Mark is one of those individuals.

Mark is not without insight into his problems. His lengthy personal statement is revealing (Exhibit A). He notes:

> There is a lot I wish I had handled differently. I wish I had the courage to ask for help sooner. I wish I had known that honesty admitting my faults and weaknesses is a strength. I wish I had given support and love to my ex-wife and to myself rather than run away and create a fantasy world of avoidance. I feel sick and ashamed about the decisions that I made in that time period. They were self-serving, short-sided and just plain stupid. I stopped paying mortgage bills on the investment real estate. In

fact, I stopped opening the mail. Three of the investment properties were lost to foreclosure in this time period. Each one of them had significant equity that was lost.

I believe that if I had faced my fertility problems, my marriage problems and my mental health issues back when they arose then I would not be here now. If I had chosen deliberate action over impulse, then alcohol and illegal drugs would not have been needed by me as a way of escape.

A friend that he met in rehabilitation talks about how Mark came around to address his problems. (Exhibit D). He notes that they spoke in depth about their personal problems, how they had both suffered trauma and about the shame and pain that came with addiction. Their discussions, he notes, were not a "pity party" that Mark sought to address his rehabilitation with resolve and enthusiasm.

A life-long friend, Steve Raucci, reveals a more positive side to Mark. (Exhibit E). He notes that Mark has for more than 15 years extended himself to assist a friend who suffers from anxiety as well as substance abuse. Mark has consistently reached out in support of that friend, demonstrating his positive strengths which are worthy of consideration as part of the sentencing process.

**GUIDELINE ISSUES**

There is no dispute with the arithmetic of the Guidelines calculation in Paragraphs 19 through 28. It results in a total offense level of 17 and a sentencing range of 24 to 30 months. There are, however, aspects of the Guidelines that apply to provisions of 3553(a).

First, there are proposed amendments to the Guidelines which have been approved by the Sentencing Commission[7]. The proposed amendments provide an additional two-point sentence reduction where, as here, the defendant is a zero-point offender. See Proposed Amendment U.S.S.G. § 4C1.1. Mr. Carbutti meets the criteria for this proposed amendment because (1) he did not receive any criminal history points; (2) he did not receive an adjustment under § 3A1.4 for terrorism; (3) he did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) there was no dangerous weapon involved in instant offense; (8) the instant offense is not covered by U.S.S.G. § 2H1.1 (offenses involving individual rights); (9) the defendant did not receive an adjustment under U.S.S.G. §3A1.1 or 3A1.5 (involving hate crimes or human rights offenses); and the defendant did not receive an adjustment under U.S.S.G. § 3B1.1 for an aggravating role and was not engaged in a continuing criminal enterprise. Unless Congress enacts laws to modify or disapprove any amendment, which was voted on unanimously by the Sentencing Commission, this adjustment will take effect on November 1, 2023. Accordingly, Mr. Carbutti respectfully seeks a downward variance of two points to account for the Sentencing Commission's proposed amendment.

---

[7] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf

The second issue involves an apparent anomaly in application of Section 2T1.1, Application Note of that section and Section 2T4.1, the tax table. The issue is identified in Paragraph 19 of the PSR. The Note requires that penalties and interest be included in the tax loss amount in willful evasion of payment cases and willful failure to pay cases. But, in all other cases of evasion – the same statute, 18 U.S.C. 7201 – including failure to file, filing false returns, claiming fraudulent deductions – the tax loss for Guidelines purposes is only the amount of taxes owed.[8]

This requires a closer look. There is no claim here that Mark filed false returns, claimed inappropriate deductions, or failed to file tax returns. He didn't lie, cheat or hide. He just didn't pay. The Government's claim is that Mark filed accurate returns and had the ability to pay and didn't. Under Note 1, by adding interest and penalties on top of the taxes due. Mark goes from G to H and two points are added to his offense level 20 to 22. The taxes due are less than $550,000.00 (2T4.1(H)); but, by including more than $200,000.00 in penalties and interest ups the offense level to 22 (2 and 4.1(I)).

The result is that the defendant who chooses to lie on his tax returns, intentionally claims false deductions, or fails to file tax returns at all, is treated more favorably than someone who files accurately and simply does not pay. There appears to be no empirical basis for this distinction.

---

[8] The applicable provisions without intricate analysis are 2T1.1 and Application Note 1 and the tax loss tables in 2T4.1. The tax loss table is in ascending financial brackets, A through P, each bracket adds two points. Section 2T1.1 requires reference to the brackets in 2T4.1 to calculate the proper offense level.

If the amendments were applied or the taxes due amount only considered the offense level would be 15 with an exposure of 18-24 months.  If both were applied, the level would be 13 with an exposure of 12-18.

A third consideration is identified in Paragraphs 77 and 78 of the PSR and applies directly to the obligations to avoid unwarranted sentencing disparities set forth in 3553(a)(6).  The report notes that for individuals in Mark's Guideline category – zero criminal history points at Level 17 in tax cases – the average and mean incarceration is 16 months.

**DETERRENCE**

The sentencing statute requires consideration of the need for deterrence. This is always an interesting subject matter with no definitive conclusion.

Specific deterrence has been achieved.  Mark Carbutti, with no criminal history, has been prosecuted and will be sentenced to incarceration.  He will not offend in the future.  How or whether the sentence in this case will affect others in Cheshire, Connecticut, New England, or beyond is impossible to gauge.

What we seem to know through experience is that a sentence of incarceration can have some effect on some people.  The length of that particular sentence in any one particular case is less significant than the fact of incarceration itself.  This is especially so in tax cases.

**INCREMENTAL PUNISHMENT**

Mark has never been charged with a crime, and never before served a term of incarceration. Therefore, the theory of incremental punishment suggests that a low sentence would be appropriate here. *See United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) ("A major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses."). Accordingly, a term of imprisonment of one year and one day satisfies the theory of incremental punishment and is warranted here.

**CONCLUSION**

We believe, as stated in the opening paragraph, that a sentence of incarceration of a year and a day is sufficient but not greater than necessary to achieve the ends of the sentencing statute. It is justified by application of the 3553(a) considerations.

This is a non-violent financial crime committed by a middle-aged adult who has no criminal history. The victim is institutional. The crime was not committed with a specific intent to evade payment of taxes; the non-payment was the inevitable consequence of substance abuse related to an emotional condition which resulting from a medical problem at birth and a second medical problem during marriage. Both events were devastating.

Mark's heart condition at birth left him physically and emotionally scarred with feelings of anxiety and low self-esteem. That was magnified by a medical diagnosis of infertility which was devastating and confirmed his belief that he was defective. He sought refuge in drugs, alcohol, gambling and a reckless lifestyle. He did not pay his taxes even though he had sufficient financial investments that were monitored which could have provided the required funds. His success as a lawyer did not immunize him from the consequences of his medical problems conditions[9].

Mark has taken significant steps to treat, amend and rectify his substance abuse; however, he continues to deal with more substantial depression and anxiety problems.

Mark's clients have been protected by a referral arrangement secured with other counsel. There is, as well, a substantial likelihood of significant restitution.

The Guideline issues identified – the proposed amendments which would provide a two-level decrease for a non-violent crime because of no criminal history; the apparent anomaly under Application Note 1 to Section 2T1.1 which includes interest and penalties in the tax loss amount resulting in a two-level Guideline increase; and the results of an audit for earlier years applied to the 2013 taxes due amount – combined justify a non-Guideline sentence.

---

[9] It is impossible to resist referring to the "If you prick us do we not bleed? speech from The Merchant of Venice the benefits of being a "successful" lawyer are often illusory.

Mark has shown significant contrition. There has been specific deterrence as to him. A sentence of incarceration no matter the length is consistent with a theory of general deterrence.

The JSIN information in Paragraph 77 and 78 demonstrates that the requested sentence is not disproportionate to other sentences imposed for the same crime in similar circumstances.

Dr. Baranoski states:

> In my opinion, Mr. Carbutti's legal predicament, loss of his law practice, and disruptive behaviors were the direct proximal consequences of his alcohol and cocaine use disorders rather than the result of criminal propensity or antisocial personality characteristics. It is also my opinion that the onset of his alcohol and cocaine addiction resulted from the impact of the diagnosis of infertility that triggered his unresolved childhood identity as a defective unacceptable person. The diagnosis of infertility could be devastating and emasculating for any man. The impact for Mr. Carbutti, however, was magnified by his early experience – the diagnosis was not only emasculating but confirmed his identity as a defective. The sequence of events, the sudden disruption of his successful career and marriage, and the absence of a history of criminal behavior or addiction lend support to my formulation.

Baranoski Report,
Exhibit B, p. 17.

Mark's case is unique.  The requested sentence is justified.

RESPECTFULLY SUBMITTED,

THE DEFENDANT,
MARK CARBUTTI

By _____
William F. Dow, III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
Telephone:  203-772-3100
Facsimile:  203-772-1691
E-Mail:  wdow@jacobslaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 27, 2023 the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

William F. Dow, III

# EXHIBIT A

# STATEMENT OF MARK CARBUTTI

I want the Court to know that I accept full responsibility for what I did and the consequences of what I did. I am devastated when I look back at my actions. I am embarrassed, ashamed, and most of all, disappointed in myself. I want to believe I am a better person than what this experience shows. I believe I have taken steps as much as possible to keep myself on track. I have tried to set forth below the reasons for my actions; an explanation not an excuse.

I am going to refer to a number of stressful events that were occurring in my life during the time period of about 2012 through 2020. I point these things out as context for my actions and do not intend them as excuses. I am responsible for the choices that I made. I chose oblivion over responsibility. I chose impulsive escapist behavior over deliberate action. I chose to use illegal drugs and to abuse alcohol to avoid what I perceived to be the hard things in my life. I lost myself, but before I did, I chose the direction I was headed, and I am terribly ashamed of that.

I grew up in a close knit and loving family. I have three older brothers and my parents have been married for 57 years. I have 6 nieces and nephews. We get together regularly and often. No one in my family drinks much at all, no one smokes, and no one does drugs. This statement included me until about the year 2012 which is when things began to unravel for me, and I started down the path toward making a series of shamefully poor decisions that have led me to where I am today.

I think that long before drugs or alcohol or gambling were a problem for me (and they were a major problem for me), I had a more fundamental problem with an anxious and insecure way of thinking that came to be as a result of my congenital heart defect. So, I have learned that I am someone who is susceptible to drugs and alcohol and also to avoidance behaviors because my way of thinking about myself was skewed as a child. I grew up feeling that I was defective, a word I had so often heard associated with me. I used to have a crippling feeling of anxiety and insecurity often triggered by the scar on my chest and thinking about the condition of my heart. The fact that I can admit this truth about me I think is a new strength. Because that was the first thing in my life that I pushed away and avoided, never wanting to face it. I avoided taking my shirt off until I was almost thirty. My earliest memories as a child were of trying to catch up to my brothers but not having the strength. I would just lay down and fall asleep watching them run ahead. This was a symptom of my condition prior to the corrective surgery at age 5. Afterwards, I was often reminded that pre-surgery my parents were in the habit of checking behind their cars in the driveway before backing out to make sure I was not sleeping there.

I am very lucky to have been encouraged to seek initial treatment for mental health and addiction at Sierra Tucson, an inpatient treatment facility in Arizona in October of 2020. It was there that for perhaps the first time in my adult life I was completely honest with myself and to other human beings. It was liberating. Over the year and a half that followed I participated in in therapy at several facilities. All difficult but overwhelmingly positive experiences for me. I learned that I can choose to live a life of deliberate action where honesty with self is a central tenant. Where I have nothing to lose and everything to gain when I am truthful with myself about why I might be feeling a certain way.

I was married in 2007. Soon after we began to try to have children to start a family. Things were going well and had been going well for a long time. My law business was on the rise and was making money. I had made several well-timed multifamily real estate investments that provided positive monthly income. We purchased a three-bedroom home in North Haven and completely rehabbed it together, inside and out. My ex-wife was employed by a large company as an attorney. We were ready to have kids. After a few years of trying to start a family on our own without success, I saw a doctor at the Yale Fertility Clinic in New Haven in 2009 who performed a number of tests. I was surprised to discover that I was born with an uncommon infertility condition. I was told that the only chance I had for biological children was the in-vitro procedure.

I did not hesitate. I was all in. I did not anticipate the toll this would take on my ex-wife or myself. A few weeks after the first procedure we were informed that it was a success and that she was pregnant. Two weeks later we were told that this was a false positive which happens sometimes as a result of the medications. So, she was not pregnant and never had been. We persisted.

Between 2009 and late 2012 we tried five unsuccessful rounds of in-vitro fertilization at the Yale Fertility Clinic. This was a stressful time and it put a lot of strain on our marriage. At that time, I made the terrible choice to drink more and go out more. This was part of a pattern of avoidance that I would shamefully repeat. I can see it clearly now after a lot of self-reflection, recovery and work.

In late 2012 we made the decision to stop trying to have children. This was terribly disappointing to me and to my wife. I had wanted children of my own and especially so because I knew my parents were looking forward to me having their grandchildren. This just amplified my feelings of inadequacy.

Shortly after filing papers, I learned that my wife was diagnosed with brain cancer. This was another problem which I chose not to deal with. It was another factor, as I look back on it, that drove me into drinking and drugging and gambling as well. Divorce wasn't final until late in 2016.

To avoid this painful realization, I did what I had done as a child, created a fiction in my mind to avoid reality. I chose to create the fiction that I didn't want kids. I was not being honest with myself. At the time, despite the positive, carefree appearance I sought to portray to the outside world, I was depressed, stressed, guarded and listless.

In 2013, I discovered that a longtime trusted employee of my business had been embezzling money from me for years. I filed a police report and fired the employee. The full extent of the embezzlement was undetermined, but we believed the loss was well over $150,000. A police investigation proceeded which estimated losses in the $150,000 range. I did not take the betrayal well. It felt like I had lost a member of my family. I felt more and more that life was happening to me. That life was unfair to me. Looking back, I am ashamed of the way I reacted to this

adversity. By ignoring these problems, I compounded them and created more problems for myself and other people. The earlier I faced these problems head on the better it would have been for everyone.

In 2014, my ex-wife quit her job of 10 years. This was an additional source of conflict between us. Later that year, I was informed that the IRS would conduct a tax audit as a result of an amended return that was filed electronically by our accountant. He was trying to reflect embezzlement losses in an amended return which resulted in the audit.

By mid-2015 our marriage problems seemed insurmountable. We separated by June of 2015; she remained in our house, and I moved to a house in Madison. Living on my own in Madison, my drinking and drug use got progressively worse. I was drinking and using every day. I was about 40 minutes away from my office and the same distance from my immediate family, they all live in Wallingford. I became increasingly isolated and was only coming to the office several days a week.

By fall of 2015, an action for dissolution of marriage was brought by my ex-wife.

By 2016, I was spending very little time in the office.

There is a lot that I wish I had handled differently. I wish I had the courage to ask for help sooner. I wish I had known that honestly admitting my faults and weaknesses is a strength. I wish I had given support and love to my ex-wife and to myself rather than run away and create a fantasy world of avoidance. I feel sick and ashamed about the decisions that I made in that time period. They were self-serving, shortsighted and just plain stupid. I stopped paying mortgage bills on the investment real estate. In fact, I stopped opening the mail. Three of the investment properties were lost to foreclosure in this time period. Each one of them had significant equity that was lost.

I believe that if I had faced my fertility problems, my marriage problems, and my mental health issues back when they arose then I would not be here now. If I had chosen deliberate action over impulse, then alcohol and illegal drugs would not have been needed by me as ways of escape.

Alcohol and drugs, and gambling, I see them as they are now, distractions that took my mind off the depressing darkness for the short term but only compounded my long-term problems. Like many others, I tried to fill the void in me with whatever I could. Sometimes it was flashy spending and trying to be the big shot, or posing as someone who I am not just to please others. Sometimes it was gathering superficial friends. It doesn't matter what I put into the void; nothing could fill it. I avoided my family the people who really cared about me the most and who I needed the most. I tried to prop myself up with false pride, alcohol and drugs.

At one point I was consumed by reading and thinking. When I look back now, I realize that from 2015 to 2020 I did not read a single book. That is simply unbelievable to me. I am shocked by that. Although this is a minor and personal "issue", when I see that lapse, it tells me how far I had lost my way.

When I look at my actions in the past from the perspective of today, I realize how pitiful and self-centered and, really, cowardly I was. While I can say that this will never happen again; that I have committed to dealing with life's problems head-on; that I am a better disciplined person than I was, I am still haunted by the way I conducted myself. I have made a commitment to be truthful to myself and to truthful to others. I hope to be able to live up to that. I know, as all substance abusers say, it is a day-to-day proposition.

I hope the Court will take all of this into consideration in imposing the most lenient sentence possible.


Thank you,

Mark Carbutti

# EXHIBIT B

**Filed Under Seal**

# EXHIBIT C

# Levy, Leff & DeFrank, P.C.

David A. Leff *
Steven J. DeFrank
Kristie M. Stutsky *
Colleen G. Casini

*Admitted NY and CT Bars*

*Attorneys at Law*
*129 Church Street, Suite 712*
*New Haven, Connecticut 06510*

*Telephone: (203) 777-6887*
*Facsimile: (203) 776-9448*

Paralegals

*Heather Corso*
*Tracy Caristinos*
*Jennifer Staski*
*Autumn Sheffy*

April 24, 2023

William F. Dow, III, Esquire
Jacobs & Dow, LLC
350 Orange Street
New Haven, CT 06511

Re: Office of Chief Disciplinary Counsel v. Mark Carbutti

Dear Attorney Dow:

You asked me to provide information of my activities as court-appointed trustee for the law practice of your client, Mark Carbutti.

On September 10, 2020, I was appointed by the Superior Court for the Judicial District of New Haven to act as Trustee for Mr. Carbutti's practice. I was informed that he had been placed on inactive status on October 2, 2020 in connection with case #NNH-CV20-6106281-S.

In my role as Trustee I have received funds from the resolution of numerous cases handled by Mr. Carbutti's office. The total amount of monies received to date is $599,966.10. Those funds are sufficient to cover all outstanding obligations to clients of the firm (principally personal injury clients) and all costs associated with those claims.

I am required to remain as Trustee for the law firm. I anticipate I will be receiving in the future additional funds from attorneys to whom the firm's cases have been referred with an understanding that the firm will be entitled to fifty percent of all fees received by the referring attorneys.

I anticipate I will be obliged to honor any restitution orders issued by the United States District Court for the District of Connecticut before whom Mr. Carbutti is to be sentenced in the criminal matter in which you are his attorney. I will, of course, honor that obligation.

Please contact me if I can provide additional information.

Very truly yours,

Steven J. DeFrank

# EXHIBIT D

Dear Judge Nagala:

I submit this character letter on behalf of my friend, Mark Carbutti. I met Mark in October 2020, when we were in a rehabilitation/recovery program at Sierra Tucson in Arizona. From the moment I met Mark at the Sierra Tucson intake center, I knew we were going to be close friends. It helped that Mark and I are both lawyers, but what really stood out to me was Mark's openness, warmth, and irrepressible optimism. While other rehab patients were quick to make small talk and share stories, Mark promptly opened up about his struggles with alcohol and drug addiction, and the toll that it took on his family, his relationships, his career, and his finances. That, in turn, helped me open up about my problems—specifically, my diagnosis with Parkinson's Disease in 2012, the end of my 20+ year marriage shortly thereafter, and my struggles with anxiety, depression, and addiction brought on by the shame of losing my health and my marriage within a few months of each other. I credit Mark with helping me face my own demons through the example he set by confronting his problems with openness, integrity, and honesty. After two weeks at Sierra Tucson, my insurer refused to cover any more in-patient treatment, so I was forced to leave to find treatment at a partial hospitalization program (PHP). It was hard to leave Sierra Tucson so abruptly, particularly because I was also leaving the person who was so instrumental in helping me through this challenging period. As I left Sierra Tucson for the Nsight PRP program in Costa Mesa, California, I was sad and frightened that I would have to continue my journey without Mark's upbeat, positive presence.

After a few days at Nsight, I learned that Mark was also transferring from Sierra Tucson and would be my roommate at Nsight. I also learned that Mark would be a part of my therapy group, as would several other individuals who had been at Sierra Tucson. The ensuing 4-5 weeks at Nsight with Mark and others were truly life-changing. As I got to know Mark better, I learned a great deal about his past and how he ended up in a rehabilitation facility. Mark completely opened up to me and to others in our therapy group about the nature and scope of his addiction, his legal issues, and his desire to change his life. Through our therapy sessions, we learned that we had both sustained severe trauma early in life and that we harbored a great deal of shame and pain that we masked with addictions. But it was not a pity party—far from it. Mark owned all his problems and took full responsibility for his predicament. Rather than blaming his problems on prior events, he used those events to gain the insight that would help him from repeating those mistakes. Mark approached recovery and sobriety with the same resolve and enthusiasm that he displays in all facets of his life. In doing so, Mark not only set a lofty standard for himself, but also served as a shining example to many of his rehab cohorts (including me) that helped us in our recovery. I will remain forever indebted in gratitude for the guidance, the example, and the love that Mark showed me as we commenced the slow, steady journey to recovery.

I am fully aware of the gravity of Mark's crime of tax evasion. But I'm equally aware that Mark fully understands the wrongfulness of his misconduct, that he accepts the punishment that will be meted out, and that he has taken the steps necessary to prevent that misconduct from recurring. Mark recognizes that he has one chance to turn his life around and, from everything I've seen from him over the past two years, he is absolutely committed to making that

happen.  Mark is a true shining star who has yet to realize his full potential—once he does, I have no doubt that he will have a positive impact on his family, his friends, and his community.  I respectfully ask that you consider these observations in determining an appropriate punishment for Mark Carbutti.  If you have any questions or would like additional information, please call me at 503-502-0270 or email me at brucelairdpdx@gmail.com

Sincerely,


Bruce L. Campbell
1051 SW Ardmore Ave.
Portland, OR  97205
Oregon State Bar # 925377

# EXHIBIT E

Dear Judge,

I am writing this letter in support of Mark Carbutti. Even if I had known years ago that I'd be writing this I would never have been able to predict that the dominant and driving emotion I feel, as I gather my thoughts to share with you, is pride. I feel privileged to write this. I am proud to share with you who Mark is today, and who he always has been. I'm proud to know him, and proud that the best friend I've ever had has asked me to consider doing this.

Our friendship began in pre-kindergarten and by middle school we had formed a bond that has proven itself unbreakable. Throughout high school I just about lived at the Carbutti house and even stayed there many if not most weekends. It was simply a much healthier environment than my own home. Our high school girlfriends were best friends. We double-dated and carpooled to proms. We stayed close during college, visiting each other's universities on weekends while challenging and motivating each other during our years-long "best GPA" contest for bragging rights. Over the past 20+ years our friendship has transformed. Now instead of staying out late we meet up for morning coffee. We play over-the-board chess once a week.

As I became a husband, a father, and built a career I lost touch with so many people. I'm incredibly thankful for my friendship with Mark, it has endured, grown even, and today it holds a special place in the center of my circle.

Mark is the most encouraging and supportive person I've ever known. He genuinely wants to help people and goes miles out of his way to do it. He'll gladly just listen to you if that is what you need most. He'll offer you caring yet incredibly intelligent advice if you ask him for it. Mark believes in people, ALL people, and he's always jumped at every chance to prove that by offering his time, thoughts and help to whomever he feels needs it. Mark is someone you reach for when you need help. Many people do. I certainly do.

As close as we were early in life I'm not sure I recognized these traits in him right away. The way he treated me was just what best friends do right? My eyes started to really open in regards to just how invested he is in other peoples' success and happiness shortly after he opened his own practice. Mark started getting visits from what I would call "ghosts"……..people we knew and were even friends with during public school that we'd stopped spending time with long ago. To me Mark was a sitting duck, these people knew where his office was and would simply walk right in and lay all of their problems at his feet. To be honest these acquaintances were people I'd seen over the years and ducked to avoid. They all wanted help of some sort, and in one way or another, and in more ways than one, he helped them all. Mark would clear off from whatever he was working on and talk to them for hours. He listened, offered them advice, even "loaned" them money. I'd hear about it and roll my eyes and tell him these old "friends" would never listen and would never change. Didn't he know he'd never get that time or money back? Mark would roll his eyes back at me assuring me he knew that already, and he didn't care. There it was, he just wanted to help them, just needed to try.

Mark has always believed that everyone deserves and is worthy of our support, our encouragement, our time and our positivity. A one-in-one thousand chance to help someone was then, and will always be, more than enough for him. Mark will never give up on people, ESPECIALLY when he senses people have given up on themselves. Mark has the desire to get people to recognize the merit in themselves, the good in others, and the brightest side of whatever their current difficult situation may be. He endeavors to help people raise their heads from their lowest points. If you have lost something, or someone, or simply feel lost this is someone you want to be around and at those times he WANTS to be around you. He does all of this, over and over again for decades now, without conditions or limits.

It's been easily twenty years now that I've been keyed into this most amazing part of Mark Carbutti. He can't surprise me anymore. He'll help friends, family, friends of family, friends of friends and strangers which I believe covers just about all human beings. If Mark has set boundaries on who he will not try to help, encourage or support I can't see where those boundaries are. I've personally watched Mark offer himself as a main source of support to people going through difficult times such as divorce, sickness and financial hardships. Not legal advice......... real, genuine and incredibly human emotional support. Mark and I have a very close mutual friend whose been battling debilitating anxiety and depression for 15 years. This friend's addiction to the related prescription medications has become just as significant an obstacle to recovery. I have run out of hope admittedly but Mark's belief system refuses to let him do that. We go and visit our friend and the conversation sounds just like it did 15 years ago. Mark is encouraging him to try different methods of treatment, pleading with him to look into different treatment facilities, or to meet with a new therapist or perhaps even a new medical doctor. Mark has told me before that he believes that anyone with the right support can persevere and I've heard him wonder just how many great people there have been throughout history that simply didn't have any support at all. If you watch him it's obvious he's determined to do more than his part. Right now Mark is mentoring his nephew, spending countless hours connecting with him while also trying to encourage him to take his schooling, his choices and himself more seriously. When I had a health scare and needed someone I could talk to and confide in aside from my wife Mark was the only person I felt comfortable going to. His positivity and assurance really helped me get through those very frightening days of tests and results.

Ironically, during a time when most human beings would finally put the needs of others on hold and worry solely about themselves, Mark is doing the opposite. He's counseling, supporting and encouraging those of us that love him. Mark is not allowing us to feel sorry for him. He's not giving us a chance to be angry with his legal situation or any of the parties involved in this legal process. Mark and I have been meeting to talk and play chess at least once a week for a few years now and not one single time has Mark vented or complained about his current situation. I've learned he doesn't do this because he doesn't need to, the emotions that fuel that behavior, anger and bitterness, simply aren't there. This is his fault. He'll begin his conversation with you by telling you that. He'll remind you of that with his parting words.

In between he talks about the peace he feels, peace that has come with acceptance of his situation alongside the admission of his mistakes. If you nudge him he'll even talk about his excitement for the future. Excitement about ultimately having the opportunity to do a lot of things over again, many of them differently, many of them better.

I haven't told him yet that I think some of us, myself especially, failed him perhaps. This man that literally jumps to help and support people, will let just about anyone lean on him, was going through a really dark time for years leading up to and after his divorce. He was making terrible choices and I think a lot of us knew that. But Mark was someone you never worried about, he was the person you reached out to when you were worried right? He's been there for so many people so many times, did we do enough to help HIM? I won't bother telling him that because that notion only undermines the accountability he's embraced, which is full and absolute. It's on him, and here's why, and we're moving forward. I'll be very proud to be a part of his future.

Please consider these things when deciding on Mark's sentence. Please feel free to contact me anytime on my cell phone (203) 592-8576 if you have any questions.

Sincerely yours,


Steven Raucci